[Cite as *State v. Hart*, **2017-Ohio-4079**.]

haCOURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                        |   | JUDGES:                    |
|------------------------|---|----------------------------|
| STATE OF OHIO          | : | Hon. W. Scott Gwin, P.J.   |
|                        | : | Hon. John W. Wise, J.      |
| Plaintiff-Appellee     | : | Hon. Earle E. Wise, J.     |
|                        | : |                            |
| -vs-                   | : |                            |
|                        | : | Case No. 2016AP100052      |
| JAMES A. HART          | : |                            |
|                        | : |                            |
| Defendant-Appellant    | : | O P I N I O N              |


CHARACTER OF PROCEEDING:         Criminal appeal from the Tuscarawas
                                 County Court of Common Pleas, Case No.
                                 2015CR120304


JUDGMENT:                        Affirmed


DATE OF JUDGMENT ENTRY:          May 31, 2017


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant
MICHAEL J. ERNEST                         MARK A. PERLAKY
Assistant Prosecuting Attorney            Public Defender's Office
125 E. High Avenue                        153 N. Broadway
New Philadelphia, OH 44663                New Philadelphia, OH 44663

*Gwin, P.J.*

{¶1}    Defendant-appellant James A. Hart ["Hart"] appeals the August 15, 2016 and September 20, 2016 Judgment Entries of the Tuscarawas County Court of Common Pleas overruling his motion to suppress.

*Facts and Procedural History*

{¶2}    On December 7, 2015, Hart was indicted on one count of Possession of Marijuana, a felony of the third degree.   On May 31, 2016, Hart filed a Motion to Suppress Evidence.  The following evidence was adduced during the hearing on Hart's motion to suppress.

{¶3}    On August 6, 2015, Agent Kim Nusser from the Ohio Bureau of Criminal Investigation along with Tuscarawas County Sheriff's deputies engaged in a marijuana eradication program in Tuscarawas County Ohio.  Agent Nusser testified that he was a passenger in a helicopter that flew over Hart's home, and in doing so, he spotted what looked like marijuana growing near the back of his home.

{¶4}    Agent Nusser testified that he is trained in spotting marijuana from a helicopter.  Agent Nusser described seeing marijuana plans sitting in close proximity to Hart's home. Although he could not recall the exact altitude on the day in question, Agent Nusser testified that the helicopter generally flies at an altitude between 700 and 1,000 feet.  (T. at 16).  Agent Nusser informed deputies on the ground that he had observed the suspected marijuana.  Agent Nusser was aided by a GPS-like device, which gave him the coordinates of the location.  The device did not provide a view of the property or identify the owner of the property in question.  Agent Nusser used these coordinates to direct agents on the ground to the nearest cross street.  From these observations and the

direction of Agent Nusser, Detective Jeff Moore and Lieutenant Brian Alford of the Tuscarawas County Sheriff's Office went to Hart's home.

{¶5} Deputy Moore stated that he met with Hart upon his arrival and found him to be very forthcoming (T. at 51). Detective Moore testified that Hart asked why the helicopter was present at his property, and Moore indicated that it was because marijuana had been spotted at the location. According to Deputy Moore, Hart stated, "I have marijuana growing at the back of the property. Come on back. I'll show you." (T. at 51). Deputy Moore stated that he and Hart then walked to the back of the property where they observed various marijuana plants growing (T. at 51- 52). Deputy Moore testified that Hart voluntarily took him to the back of the property (T.at 52). Deputy Moore stated that neither he nor Deputy Alford or any other officer had a weapon drawn or out at this time. (T. at 92). As a result of Hart taking the deputies to the back of the property, the deputies then sought and obtained a search warrant for the inside of the Hart's home. Upon cross-examination, Detective Moore noted that approximately 30 agents were present at Hart's home on the date in question. (T. at 57). Detective Moore also testified that even though Hart was very forthcoming in showing officers what was growing outside his home, Hart denied entrance into the inside of his home. Detective Moore was positive that Hart gave his consent and voluntarily showed him and Deputy Alford where the plants were located. (T. at 58).

{¶6} Lieutenant Brian Alford testified that he was in uniform and arrived in a marked sheriff's cruiser. Lieutenant Alford explained to Hart why he was there, along with Detective Sergeant Jeff Moore, conversing with him while the helicopter circled above. Alford testified that he was following Hart around the property, and although

Alford could not recall what Hart said as he was walking around, he testified Hart was very accommodating and friendly. Lieutenant Alford did recall Hart stating that he was growing marijuana for his own personal use. (T. at 38).

{¶7} Hart testified that he was out running errands and was returning home when he saw a helicopter circling around his property above the trees surrounding his home. He further testified that Detective Moore and Lieutenant Alford pulled into his driveway and came up to the bushes near his home. Several unmarked police cars, along with uniformed officers carrying firearms were spread around his property at the time. Hart testified that no permission was given to search the property, nor was permission asked.

{¶8} Hart further testified that he was not rude with officers, but that he absolutely did not feel that he could refuse permission to the officers to be on his property. Upon cross-examination, Hart indicated that he was not talking with the officers, but was on the phone to "NORMAL[1]" regarding his legal rights in the situation. Hart testified that he did not say anything when asked by officers if he knew why they were there, as he chose to walk away instead. Hart testified that he was followed by officers onto the property as he did so. Hart testified regarding his anxiety and helplessness about being surrounding by officers carrying firearms that day.

{¶9} In a Judgment Entry dated August 15, 2016, the trial court overruled Hart's Motion to Suppress Evidence. Hart filed a motion for more specific findings of fact, specifically requesting whether the initial helicopter flyover of Hart's property was lawful, whether technology used by law enforcement to locate the property was generally available for public use, and what specific facts the Court used in finding that Hart

---

[1] National Organization for the Reform of Marijuana Laws. (T. at 71).

consented to the search of his property. The trial court granted the motion. On September 20, 2016, the trial court issued a Judgment Entry finding that Detective Jeff Moore and Sergeant Brian Alford were credible, and that the court believed that Hart consented to a search of his property on the date in question.

{¶10} On the same date, Hart asked the court to reconsider its denial of his motion to suppress evidence and to submit additional evidence, namely, video submitted by a neighbor. The Court did allow Hart to submit additional evidence, but denied reconsideration of its decision.

{¶11} Hart entered a plea of No Contest to the indictment and was sentenced to one year of non-reporting Community Control Sanctions, and a $500 fine.

*Assignment of error*

{¶12} "I. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE, AS LAW ENFORCEMENT: 1) VIOLATED *KYLLO V. UNITED STATES* TO LOCATE AND ENTER ON TO APPELLANT'S PROPERTY, AND 2) ILLEGALLY ENTERED ON TO THE CURTILAGE OF APPELLANT'S PROPERTY."

*Law and Analysis*

***Standard of review.***

{¶13} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 154-155, 797 N.E.2d 71, 74, 20030-Ohio-5372 at ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap* (1995), 73 Ohio St.3d 308, 314, 652 N.E.2d 988; *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583. Accordingly, a reviewing

court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings.  See *Burnside,* supra; *Dunlap,* supra.  However, once an appellate court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard.  See *Burnside,* supra, citing *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539; See, also, *United States v. Arvizu* (2002), 534 U.S. 266, 122 S.Ct. 744; *Ornelas v. United States* (1996), 517 U.S. 690, 116 S.Ct. 1657.  That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review.  *Ornelas*, supra.  Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers."  *Ornelas*, supra at 698, 116 S.Ct. at 1663.

### *Helicopter observation of Hart's property.*

**{¶14}**  Hart argues that the state utilized sense-enhancing technology to intrude on a constitutionally protected place in violation of Hart's Fourth Amendment rights as set out in *Kyllo v. United States*, 533 US 27 2001, 121 S.Ct. 2038, 150 L.Ed.2d 94, (2001).

**{¶15}**  *Kyllo* involved the use of a mechanical device that detected heat radiating from the walls of a home.  There, the Court was concerned with the use of constantly improving technological devices that, from outside a home, could intrude into the home and detect legitimate as well as illegal activity going on inside.  *Kyllo,* 533 US at 40, 121 S.Ct. 2038, 150 L.Ed.2d 94.

**{¶16}**  In *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the U.S. Supreme Court analyzed "whether naked-eye observation of the [defendant's] curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable."  The court found that the

defendant's construction of tall fences around his yard "met the test of manifesting his own subjective intent and desire to maintain privacy." Id. at 211–214, 106 S.Ct. 1809, 90 L.Ed.2d 210. The court further found, however, that the defendant could not reasonably have expected that his garden was protected from public or official inspection from the air. Id. According to the *Ciraolo* court, public airways were similar to public highways and "the mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." Id.

{¶17} In *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835(1989) (plurality opinion), the court examined whether helicopter surveillance from an altitude of 400 feet, which revealed marijuana growing in the defendant's partially covered greenhouse, constituted a search requiring a warrant. In a sharply divided split decision, the plurality concluded that the surveillance was not a "search" for Fourth Amendment purposes, noting specifically that there is no lower limit of the navigable airspace allowed to helicopters and that flight by helicopters in public airways is routine. Id. "Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse." Id. at 451, 109 S.Ct. 693, 102 L.Ed.2d 835; *Accord*, *State v. Wooley*, 5th Dist. Ashland No. 16-COA-003, 2017-Ohio-576, ¶ 25, *citing State v. Little,* 183 Ohio App.3d 680, 2009–Ohio–4403, 918 N.E.2d 230, ¶ 22 (2nd Dist.), *appeal dismissed,* 125 Ohio St.3d 1458, 2010–Ohio–2753, 928 N.E.2d 735 and *United States v. Perry*, 95 Fed.Appx. 598, 602 (5th Cir. 2004).

{¶18} The plurality also noted that although the defendant had shielded his marijuana from view at ground level, because the roof was left partially open, the

marijuana growing inside was subject to viewing from an aerial vantage point. *Riley*, 488 U.S. at 451, 109 S.Ct. 693, 102 L.Ed.2d 835. Thus, the defendant could not reasonably have expected the partially hidden contraband to be immune from being viewed from the air. *Riley,* 488 U.S. at 451, 109 S.Ct. 693, 102 L.Ed.2d 835*,* The *Riley* plurality also stated, however, that "it [was] of obvious importance that the helicopter in this case was not violating the law." Id.

**{¶19}** Accordingly, the utilization of a GPS-like device in the case at bar is irrelevant. The officers were in a place they could legally observe the marijuana plants on Hart's property.

### *Entry upon Hart's property.*

**{¶20}** While warrantless aerial observations may be permissible, warrantless seizures without exigent circumstances are not permissible. *State v. Vondenhuevel*, 3rd Dist. Logan No. 8–04–15, 2004–Ohio–5348, ¶ 16, *citing State v. Wangul*, 8th Dist. No. 79393, unreported (Feb. 14, 2002) and *State v. Staton*, 2d. Dist. No. 90–CA–62, unreported (Mar. 15, 1991).

**{¶21}** The Fourth Amendment's protection against warrantless home entries extends to the "curtilage" of an individual's home. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326(1987). "Curtilage" has been defined as an area "'so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.'" *State v. Payne*, 104 Ohio App.3d 364, 368, 662 N.E.2d 60 (12th Dist. 1995), *quoting Dunn*, 480 U.S. at 301, 107 S.Ct. at 1140. The central inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn,* 480 U.S. at 300, 107 S.Ct. at

1139, *quoting Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984).(Internal quotation marks omitted).

{¶22} *Dunn* set forth four factors for consideration in determining whether a certain area outside the home itself should be treated as curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. 480 U.S. at 301, 107 S.Ct. at 1139.

{¶23} Thus, it has been held that the only areas of the curtilage where officers may go are those impliedly open to the public. This area includes walkways, driveways, or access routes leading to the residence. *State v. Birdsall*, 6th Dist. Williams No. WM–09–016, 2010–Ohio–2382, ¶ 13. (*Citing State v. Dyreson*, 104 Wash.App. 703, 17 P.3d 668 (Wash. App. 2001); *State v. Pacheco*, 101 S.W.3d 913, 918 Mo. App. 2003); *State v. Johnson*, 171 N.J. 192, 793 A.2d 619 (N.J. 2002)). The guiding principal is that a police officer on legitimate business may go where any "reasonably respectful citizen" may go. *Birdsall, supra; Dyreson, supra; see, also, State v. Tanner*, 4th Dist. Ross No. 94CA2006, 1995 WL 116682(Mar. 10, 1995). Police are privileged to go upon private property when in the proper exercise of their duties. *See State v. Chapman*, 97 Ohio App.3d 687, 647 N.E.2d 504 (1st Dist. 1994).

{¶24} "[M]erely approaching an individual on the street or in another public place [,]" seeking to ask questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. *United States v. Flowers*, 909 F.2d 145, 147(6th Cir. 1990). The United State Supreme Court "[has] held repeatedly that mere police questioning does not

constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also INS v. Delgado*, 466 U.S. 210, 212, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Bostick,* 501 U.S. at 434–435, 111 S.Ct. 2382 (citations omitted). The person approached, however, need not answer any question put to him, and may continue on his way. *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 131975 L.Ed.2d 229 (1983). Moreover, he may not be detained even momentarily for his refusal to listen or answer. *Id.* "So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991), the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382, 115 L.Ed.2d 389.

{¶25} In the case at bar, the officers observed Hart outside his residence. The officers parked in the driveway, just as any other member of the public would or could do. The officers could lawfully walk upon walkways, driveways, or access routes leading to the residence and attempt to speak with Hart, just as any other member of the public would or could do. No Fourth Amendment violation occurred in this case when the officers approached Hart in or near his driveway in an attempt to speak with him.

***Consent to search.***

{¶26} The trial court found that Hart consented to the officers accompanying him to where the marijuana plants were growing.

{¶27} A warrantless search based upon a suspect's consent is valid if his consent is voluntarily given, and not the result of duress or coercion, either express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 862 (1973); and *State v. Danby*, 11 Ohio App.3d 38, 463 N.E.2d 47 (6th Dist. 1983). The voluntariness of consent is a question of fact to be determined from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854*.* The burden of proving that the suspect voluntarily consented to the search rests upon the prosecution. *Danby,* 11 Ohio App.3d at 50, 463 N.E.2d 47*; Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797(1968); State *v. Hassey*, 9 Ohio App.3d 231, 236 459 N.E.2d 573 (10th Dist. 1983); and *State v. Pi Kappa Alpha Fraternity*, 23 Ohio St.3d 141, 491 N.E.2d 1129 (1986).

{¶28} No Fourth Amendment violation occurs when an individual voluntarily consents to a search. See *United States v. Drayton*, 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242(2002) (stating that "[p]olice officers act in full accord with the law when they ask citizens for consent"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854(1973) ("[A] search conducted pursuant to a valid consent is constitutionally permissible"); *State v. Comen*, 50 Ohio St.3d 206, 211, 553 N.E.2d 640 (1990). In *Schneckloth,* the United States Supreme Court acknowledged the importance of consent searches in police investigations, noting that "a valid consent may be the only means of obtaining important and reliable evidence" to apprehend a criminal. 412 U.S. at 227-228, 93 S.Ct. 2041, 36 L.Ed.2d 854. See, *State v. Fry*, 4th Dist. No. 03CA26, 2004-Ohio-5747 at ¶18. The United States Supreme Court further noted: "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told

they are free not to respond, hardly eliminates the consensual nature of the response." *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758(1984); *Drayton*, supra, 536 U.S. at 205, 122 S.Ct. at 2113.  Moreover, a voluntary consent need not amount to a waiver; consent can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege." *Schneckloth v. Bustamonte,* 412 U.S. at 235, 93 S.Ct. 2041, 2052 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023 (1938)); *State v. Barnes*, 25 Ohio St.3d 203, 495 N.E.2d 922(1986); *State v. McConnell*, 5th Dist. Stark No. 2002CA00048, 2002-Ohio-5300, ¶8.  Rather, the proper test is whether the totality of the circumstances demonstrates that the consent was voluntary.  Id.  Further, "[v]oluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search."  *State v. Robinette*, 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997). The voluntariness of a consent to a search is a question of fact and will not be reversed on appeal unless clearly erroneous.

{¶29}  As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses.  Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment.  *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982).  Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.  *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment

and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

{¶30} Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

{¶31} In *State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972(1992), the Ohio Supreme Court noted that the evaluation of evidence and the credibility of the witnesses are issues for the trier of fact in the hearing on the motion to suppress. *Id.* at 366, 582 N.E.2d at 981-982. The fundamental rule that weight of evidence and credibility of witnesses are primarily for the trier of fact applies to suppression hearings as well as trials. *State v. Fanning,* 1 Ohio St.3d 19, 20, 437 N.E.2d 583, 584(1982). The court of

appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence. If the trial court's findings are supported by competent and credible evidence, then the appellate court must accept them. *See State v. Williams,* 86 Ohio App.3d 37, 41, 619 N.E.2d 1141 (1993), *overruled on other grounds by Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89(1996), and *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091(1996), *as stated in Village of McComb v. Andrews*, 3rd Dist. Hancock No. 5-99-41, 2000-Ohio-1663. A reviewing court can evaluate evidence in terms of sufficiency, but it cannot second-guess the trial court's determination of credibility.

{¶32} The judge as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the [trier of fact] may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

{¶33} Based upon the foregoing and the entire record in this matter, we find the judge's decision that Hart voluntarily consented to the search to be based upon competent, credible evidence. The judge appears to have fairly and impartially decided the matters before him. The judge as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and Hart. This court will not disturb the judge's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The judge heard the witnesses, evaluated the evidence, and was convinced of Deputy Alford and Lieutenant Moore's credibility.

{¶34} We thus arrive at the same conclusion reached by the trial court. Hart voluntarily consent to Deputy Alford and Lieutenant Moore's entry upon and search of the curtilage area where the marijuana plants were located.

{¶35} Hart's sole assignment of error is overruled.

{¶36} The judgment of the Tuscarawas County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Wise, John, J., and

Wise, Earle, J., concur